[No. 19865. Department One. August 23, 1926.]

## M. J. FALKENBURG, *Appellant,* v. I. F. LAUCKS, *Respondent.*[1]

[1] PARTNERSHIP (83, 84)—DISSOLUTION—EFFECT—CONTRACT—AC-
COUNTING—AFTER DISSOLUTION. Where the dissolution of a part-
nership, holding an unperfected application for patent rights,
provided that a partner refusing to pay his proportion of the
expense of perfecting the inventions or of improvements there-
on, shall forfeit his rights, a partner refusing on demand to
stand his share of the expense of further experiments at a time
when the invention was a failure is estopped to claim a share
in a subsequent discovery which resulted in success.

[2] SAME (83, 84). A new discovery producing a successful method
of carbonizing coal at low temperatures when all other patented
inventions had proved a failure, is more than an amendment or
improvement of the former impracticable inventions, and was
patentable as a new discovery; and is therefore not within the
terms of a partnership dissolution fixing the rights of the parties
to the original patent and improvements thereof.

Appeal from a judgment of the superior court for
King county, Paul, J., entered July 3, 1925, upon find-
ings in favor of the defendant, in an action for a part-
nership accounting, tried to the court. Affirmed.

*Bausman, Oldham & Eggerman,* and *Roberts &
Skeel,* for appellants.

*Chadwick, McMicken, Ramsey & Rupp, Raymond D.
Ogden* and *G. Wright Arnold,* for respondent.

FULLERTON, J.—From the year 1908, until January
16, 1918, the appellant Falkenburg and the respondent
Laucks were partners, as analytical, consulting and in-
specting chemists, metallurgists and engineers. Their
headquarters, as well as their laboratory for scientific
analyses, was in the city of Seattle. One of the many
branches of the firm's business was the analysis of coal

[1]Reported in 248 Pac. 413.

and coal products. This part of the firm's work was carried on, during the later years of the partnership, by the respondent Laucks.

A client of the firm was one Frank C. Greene. He was also an engineer, and while engaged as such, brought to the firm for analysis many samples of coal. In this way he came into intimate contact with Laucks and a strong friendship arose between them. Greene had long been interested in the scheme of distillating and carbonizing coal at low temperatures, and had given the subject much thought. He succeeded in interesting Laucks in his scheme, and the two conducted a number of experiments which led them to believe in its feasibility. They designed and had constructed a retort embodying their ideas, and tests made therein led them to believe that they had made a discovery of commercial value. Greene and Laucks then entered into a contract in which they agreed to share equally in any gains that might be derived therefrom, and applied for a patent for the device. This patent was applied for in the name of Greene and Laucks as inventors, although Laucks at all times recognized that his partner Falkenburg had a half interest in his share therein.

The situation with relation to the invention was in the condition outlined at the time of the dissolution of the partnership, which occurred, as we have indicated, on January 16, 1918, and it became a subject of controversy when the terms of the dissolution agreement were under consideration. It was realized that the scheme was still in an experimental stage, and Falkenburg's insistence was that he was entitled not only to such interests as might be acquired by the application for the patent then pending, but an interest in anything which Laucks might develop along the line of

the scheme, whether by new and later discoveries or not. Laucks would not concede to this, and the controversy was finally terminated by an agreement reading with reference thereto as follows:

"III. It is further agreed that what has been heretofore designated by the members of the firm as 'Coal Interests,' the same being represented by patent application, Serial No. 176,948, in the Patent Office of the United States, and the equipment connected therewith, shall be equally divided between the two partners, the interest of the copartnership in said coal business being an undivided one-half, making to each of the partners a one-fourth interest in said coal business, the other undivided one-half interest being owned by F. C. Greene, of Seattle, Washington; it being further understood and agreed that if either of the parties hereto shall, with the said F. C. Greene, agree upon a disposal of said coal business, by way of sale of interest in the patent covering the same, and if the other party hereto shall not agree with them, the said Greene and the other party agreeing with him may proceed on the lines to which they have agreed, but the party hereto who fails to agree with them shall not share in the results of any sale or sales that may be so made, but will still retain his undivided one-fourth interest in said patent and what it may represent, and such party shall not be liable for any expense in connection with any such sale or sales.

"It being also further understood and agreed with respect to said coal interests that if the said F. C. Greene and either one of the parties hereto shall determine to apply for amendments to said patent, or to incur any additional expense for experimentation or any other purpose connected with said coal business, then in that event if the other party hereto shall not agree to the same and shall decide that he does not wish to share in any such expense, he shall not be under obligation to contribute to such expense, and his failure to do so shall thereby be a waiver of all his interest in such patent or amendments thereto and in the said coal business; Provided, however, that he shall

be paid the sum of one hundred fifty dollars ($150) for his interest in the equipment connected with said business, it being now agreed that said amount is the full value of the interest of each party in said equipment.

"It is hereby agreed that where the term 'coal business' has been hereinbefore used, it is covered by the said letters patent and the possible amendments thereto, and by the equipment now on hand for the purpose of conducting experimentations in connection therewith, said patent being designated as aforesaid, as Serial No. 176,948.

"It is further agreed that all the stipulations herein with respect to said coal business are subject to the limitations of that certain written agreement heretofore entered into by the firm of Falkenburg & Laucks through the said I. F. Laucks with the said F. C. Greene, dated April 10, 1917, which agreement is hereby expressly referred to.

"It is mutually agreed between the parties hereto that the references made herein to coal, coal business, or coal patents, shall relate to and be limited by Serial No. 176,948 of the United States Patent Office, and all rights inuring thereunder by amendment or otherwise."

After the dissolution of the partnership, Greene and Laucks transferred their activities to Denver, Colorado. They succeeded in interesting capital in their scheme, and caused to be constructed a retort after the manner of the one used at Seattle, but on a larger scale. The coal at Seattle used in experimentation was a lignite coal. At Denver, the coal was bituminous, and it was found that the apparatus designed would not operate in this character of coal. Various changes in construction were made, but with a like result. Finally, after an expenditure of a large sum of money, their backers deserted them and they were thrown upon their own resources. Thereafter, Laucks conceived of a new device, and new capital was interested and a plant constructed at Waukegan, Illinois, on the new

plan, which, if we are correctly advised by the record, gives promise of having commercial value.

The apparatus originally designed for distillating and carbonizing the coal was that of a tube in which a revolving spiral screw was inserted. The coal was fed in the tube at the top and followed down the blades of the screw. The tube was itself in a furnace and was heated to a degree possible to expel the gases from the coal. The screw contained a hollow shaft perforated at various places, with an opening at the top. As the gases generated, they passed into the hollow shaft and out through the opening at the top, from whence they were carried by pipes to condensers where they were broken up into their constituent parts. The residue of the coal came out at the bottom of the shaft in the form of char and ashes. The apparatus would not work when bituminous coal was used, because of the tendency of that character of coal to conglomerate when heated. It would stick to the spiral screw and prevent the screw from being moved, no matter what the force of the applied power. The change in form made by Laucks was to make the screw imperforate instead of perforate, feed the coal from the bottom of the cylinder instead of the top, and apply heat to the hollow shaft. By the change in method, there was a resultant loss in the quantity of gas obtained, but an improved quality of coke, which seems to be the chief value of the process.

The patent office rejected the application for a patent pending at the time of the dissolution of the partnership, on the ground that it contained nothing new or novel. New applications, based on the same fundamental idea, but with modifications thought to overcome the objections of the department, met with the same fate. It was only when an application was pre-

sented which embodied the latest scheme discovered by
Laucks that the patent office recognized the invention
as patentable, and then only to the extent that it em-
bodied the idea of applying heat to the hollow of the
rotary screw in a manner in which it had not been
theretofore applied.

In this suit, the appellant Falkenburg sought an ad-
judication of his rights in the discovery, and to have
an accounting of the gains acquired thereby. In his
complaint and in his evidence introduced to prove the
allegations of his complaint, he made two alternate
contentions: first, that the discovery which made the
scheme valuable was but an amendment or modifica-
tion of the original conception, and was reserved to
him by the terms of the contract of dissolution, and
that he has, in virtue of the contract, a half interest in
the share of the respondent Laucks therein; and, sec-
ond, that, if it is not included in the contract, the con-
tract does not express the intent of the parties, as it
was the intent and understanding that the interest was
not only to include such discoveries as had then been
made, but such discoveries as might afterwards be de-
veloped therefrom by Laucks. In connection with the
latter contention, he also makes a charge of fraud,
averring that Laucks wrongfully and fraudulently con-
cealed from him the facts relating to the scope of the
invention, and the scheme he then had in his mind for
its further development.

Issue was joined on the allegations of the complaint,
and a trial had in which the trial judge, with fine dis-
cretion and commendable liberality, allowed the parties
to introduce any fact having even a remote bearing on
the question at issue. The trial resulted in a decree
dismissing the action with prejudice, at the cost of the
appellant.

[1] Our examination of the record convinces us that there is but little equity in the appellant's claims. By the terms of the dissolution agreement, he was obligated, under the penalty of a forfeiture of his interest, to bear equally with the respondent any expense incurred in testing out and practically developing the scheme, as well as any expense in connection with patenting the devices, yet he refused to bear any part of these expenses. The application for patent, pending at the time of the dissolution, was held for rejection by the examiner of the patent office. The respondent by letter called the appellant's attention to this fact, and asked him to share in the expense of the appeal. To this he made no response. The appeal, however, was taken at the expense of the respondent and Greene, and the appellant was again asked to share in the expense. This request he likewise ignored. Other demands were made upon him, to one of which he responded by a request for copies of the receipted bills showing the amount of the expense, but when these were furnished him he made no remittance or offer to remit.

Finally, Laucks gave him notice that he would claim his privilege, under the contract, of forfeiting the appellant's interest, and sent to him the sum agreed upon as payment in the case of forfeiture. This sum the appellant returned, saying the bills were "in error and I am not obliged to point out to you wherein the error exists." He goes on further to say that he has offsets against the claim, but these, in so far as we can discover from the record, are pure evasions. He further says that he was not informed as to the status of the situation and that information was denied him. But we do not discover that the record bears out this claim. Manifestly, prior to the time the respondent

elected to forfeit the interest, there was nothing with-held from him. The only request for information he made was promptly complied with, and the letters written him concerning the matter exhibit frankness and a desire to inform, rather than a desire to conceal. The reserve was on the appellant's part. His conduct was that of indifference, possibly because he had no confidence in the scheme itself. His attitude in this respect was in accord with his attitude while the original experiments were being conducted. He protested against them, and complained that the respondent was wasting his time in pursuing them; time that should be given to the furtherance of the regular and lucrative business of the partnership.

It is true that, after the notice of forfeiture, the respondent gave the appellant no information as to the progress of the discovery. But he was then proceeding under the belief that the appellant had abandoned and forfeited his interests in it. Nor, except in one instance, did the appellant subsequently manifest any interest. While the respondent was at Denver, the appellant called at the plant, evidently induced so to do because he had learned that persons with capital had taken an interest in it. He testifies that the respondent then refused to give him any information as to the progress he was making. But information was hardly then needed. The evidence was before his eyes that the scheme was not then perfected, and was, in so far as anything had then been discovered, a failure. The evidence, however, is clear that he never, at any other time, communicated with the respondent. Nor did he then, nor did he at any other time, offer to assist in the perfection of the scheme, nor did he offer to share with the respondent in the cost and expense he was incurring in the attempt to perfect it. His interest was

only actively aroused after he had learned that the scheme showed a promise of becoming a commercial success.

Nor do we find that the record supports the claim of fraud. There is no evidence that the respondent, at the time of the dissolution of the partnership, concealed anything from the appellant. It is possible that the appellant was not the genius of the firm, nor the highly skilled technician that the respondent is, but he was well educated in the line of his profession, and had had a long experience in its practice. While he took no part in the experiments the respondent and Greene conducted, and had not the same confidence that anything new or valuable had been discovered that the experimenters had, the record shows that he was not entirely indifferent to the work. He was present on at least one occasion when coal was distillated in the experimental retort constructed, and was informed as to the results obtained. The record very conclusively shows, however, that the subsequent discovery, which gave value to the scheme, was not then even a concept of the respondent's mind.

Nor are we persuaded that the appellant was misled as to the meaning of the contract. The business of the firm was varied. By their high skill and by close attention to business, the partners had built up for themselves an enviable reputation. The business was highly remunerative. Any satisfactory division of it was a matter of difficulty. Immediately after the parties determined to dissolve the partnership, each of them employed counsel, and all the subsequent transactions were had under advice of such counsel. The particular subject here involved was a matter of special consideration. It was the subject of various proposals and counter-proposals, and reached its final

form only after the most careful deliberation. The counsel employed by the appellant was able and distinguished, and the record discloses that he was, at all times, widely alert to his client's interests. When these facts are considered, and it is further considered that the appellant himself was learned in the terms of his art, it seems almost idle to suppose that he was deceived by the language of the contract. It is our opinion that he was not so deceived.

If it were necessary so to do, we think the judgment of the trial court could be soundly rested on the ground that the appellant has, by his conduct, estopped himself from successfully asserting any interest in the subject matter of the present dispute, even if it were conceded that the later discovery of the respondent was but an amendment to, or modification of, the discovery as it stood at the time the partnership was dissolved.

[2] But we think the later discovery of the respondent was not an amendment or modification of the discovery as it existed at the time of the dissolution of the partnership; that it was in fact a new discovery, and that the judgment can better be rested on that ground. The scheme of distillating and carbonizing coal at low temperatures is basically old. To discover a successful method for so doing has long been the effort of the artisan and the chemist. The patent office records disclose numerous patented devices intended to accomplish the objects, but all resulted in failure. The scheme and device of the respondent and Greene, as it existed at the time of the dissolution of the partnership, followed along these old lines and they, like the others preceding them, resulted in failure. It was only after the later discovery that it gave promise of value. This, in our opinion, was more than a mere improvement or perfection of what preceded it. It made practical and

9—140 WASH.

-valuable what was theretofore impracticable and unvaluable. As such, it constituted a distinct step in advance in the art, and was a new discovery. It being new, the appellant has no right to share therein.

The judgment is affirmed.

Tolman, C. J., Bridges, Holcomb, and Askren, JJ., concur.